IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PEDRO MONTES,<br><br>           Plaintiff,<br><br>     v.<br><br>COMMISSIONER OF THE<br>SOCIAL SECURITY<br>ADMINISTRATION<br><br>           Defendant. | HONORABLE JEROME B. SIMANDLE<br><br>  Civil No. 11-5264 (JBS)<br><br><br>           **OPINION** |

APPEARANCES:

Jason Lanell Thompson, Esq.
LEVENTHAL, SUTTON & GORNSTEIN, ESQS.
3800 Horizon Blvd., Suite 101
Trevose, PA 19053-4947
     Attorney for Plaintiff

Paul J. Fishman
UNITED STATES ATTORNEY
     By: Monika K. Proctor
         Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Suite 3904
New York, NY 10278
       Attorney for Defendant

**SIMANDLE,** Chief Judge:

## I.  INTRODUCTION

    This matter comes before the Court pursuant to 42 U.S.C.

§§ 405(g) and 1383(c) for review of the final decision of the

Commissioner of the Social Security Administration denying

Plaintiff Pedro Montes' application for disability insurance

benefits under Title II of the Social Security Act (the "Act")
and supplemental security income under Title XVI of the Act.

Plaintiff alleges that the Administrative Law Judge ("ALJ")
made four errors in determining Plaintiff is not disabled: (1)
the ALJ erred in concluding Plaintiff's HIV is asymptomatic, (2)
the ALJ erred by finding Plaintiff does not meet or equal the
listings under Step Three of the five-step disability analysis,
(3) the ALJ erred by rejecting the opinions of Plaintiff's
treating physician and therapist, and (4) the ALJ erred by
relying upon an incomplete hypothetical question. For the
reasons discussed below, the Court will vacate the ALJ's
decision and remand the matter to the Commissioner for further
proceedings.

## II.  BACKGROUND

### A. Procedural Background

Plaintiff Pedro Montes of Lebanon, PA, was 35 years old on
September 18, 2006, when he filed his application for disability
insurance benefits, alleging disability due to HIV positive
status, asthma, Anxiety Disorder, Major Depressive Disorder, and
a history of drug and alcohol dependence. (R. at 14.) His claim
was denied on November 2, 2006.[1] (R. at 12.) Plaintiff
subsequently requested a hearing on December 7, 2006. (Id.) ALJ

---

[1] As a Pennsylvania resident, Plaintiff was unable to have his
claim reevaluated, as the state of Pennsylvania no longer
permits the reconsideration step in the adjudication of claims.

2

Peter V. Train held a hearing on September 26, 2007. (Id.) On December 20, 2007, the ALJ found that Plaintiff was not disabled, thereby denying his application for social security disability benefits. (Id.) The Appeals Council subsequently denied Plaintiff's request for review on May 28, 2010. (R. at 3-5.) Plaintiff acquired new counsel and was granted an extension by the Appeals Council to file a civil action. Plaintiff then filed this action, and the parties completed briefing on January 31, 2013.

### B. Medical History

The Court will recount only as much of Plaintiff's medical history as is relevant to this appeal. Plaintiff began seeking treatment with Dr. John Zurlo, M.D. on August 15, 2006. (R. at 130-33.) Plaintiff revealed he had been HIV positive since 2001, though he had no follow-up treatment since his diagnosis. (R. at 130.) Upon his release from prison in June 2006, Plaintiff complained of overall weakness, headaches, palmar numbness, and white plaques in his mouth. (Id.) Further, Plaintiff reported stiffness in his neck and intermittent fevers, along with drenching night sweats. (Id.) He was not taking any medications at the time of his appointment. (Id.) Plaintiff weighed 136 pounds. (R. at 131.) After completing his examination of Plaintiff and analyzing his previous laboratory results, Dr. Zurlo concluded:

He is a 35-year old gentleman with HIV, currently
with high viral loads of 155,000 and low CD4 counts
of 133...My concern for this individual at this time
is that he might have a cryptococcal infection...he
will follow with us within a two-week period of time
in order for us to start him on antiretroviral
therapy.

(R. at 131.)

Plaintiff attended his follow-up appointment with Dr.

Zurlo on October 31, 2006. (R. at 164-65.) According to his

report, Dr. Zurlo noted that Plaintiff had taken his prescribed

medications since the initial appointment and appeared to be

"tolerating them fairly well." (R. at 164.) Along with

complaints about weakness, shortness of breath, and teeth

sensitivity, Plaintiff noted a loss of appetite which he

claimed existed prior to the start of his medications. (Id.)

Plaintiff weighed 127 pounds at the appointment, and Dr. Zurlo

reported, "Interestingly he's lost a bit of weight since his

last visit, though once again it looks like he's not missed a

single dose of his antiviral medicines." (Id.) Further, Dr.

Zurlo stated:

I'm just a little bit concerned about the fact that
this patient has not more quickly bounced back.
While, I wouldn't expect him to feel perfectly
well, this soon after starting antiviral medicines,
I am concerned about the weight loss. Often, we see
tremendous weight gain as one of the earliest
sign[s] of response to treatment.

(Id.)

Plaintiff again saw Dr. Zurlo on December 12, 2006 at which time Plaintiff complained of weakness, tiredness due to insomnia, and vertigo for the past six months. (R. at 166-67.) Specifically, Plaintiff described his experiences with vertigo as feeling like the room was spinning, thereby causing him to lose his balance. (R. at 166.) Further, Plaintiff reported depression which he claimed existed prior to the start of his antiviral medications. (Id.) Lastly, Plaintiff stated that he had lost over 20 pounds in six months and complained of a decreased appetite. (Id.) After concluding that Plaintiff's HIV was "currently well-controlled," Dr. Zurlo noted that he was "still a bit concerned about his [Plaintiff's] poor appetite and failure to gain weight despite virologic improvement." (R. at 166-67.)

Dr. Zurlo completed a Medical Source Statement for the Social Security Administration on December 18, 2006 detailing Plaintiff's history with HIV. (R. at 144-46.) Specifically, he noted that Plaintiff was diagnosed with HIV through laboratory tests and indicated that Plaintiff had ongoing Anorexia as one of the manifestations of HIV. (R. at 146.) Further, Dr. Zurlo listed significant weight loss as an additional manifestation of Plaintiff's HIV status, as Plaintiff had lost approximately ten pounds in the last four months. (Id.) Dr. Zurlo also indicated that Plaintiff experienced "marked difficulties in maintaining

social functioning." (Id.) Dr. Zurlo did not check off the box labeled "HIV Wasting Syndrome" on the Medical Source Statement. (R. at 145.)

On December 13, 2006, or three days prior to Dr. Zurlo's completion of the Medical Source Statement, Plaintiff began seeking treatment for his mental health issues at Philhaven, a non-profit behavioral healthcare organization. (R. at 181-206.) Plaintiff indicated during the initial evaluation that he was seeking treatment because of stress, depression, loss of appetite, and "thinking too much." (R. at 185.) Plaintiff noted that he had a change in his appetite and had lost a total of 34 pounds. (R. at 188.) Plaintiff also reported chest pain, racing thoughts, palpitations, dizziness, nervousness, and shortness of breath, along with a host of other symptoms of anxiety. (Id.) Further, Plaintiff stated, "I'm not feeling well. I've been depressed for months." (R. at 194.) The interviewer noted that his speech quantity and quality were normal, his weight appeared low, his motor behavior was calm as opposed to restless, and his thought processes appeared to be both logical and coherent. (R. at 191.) Lastly, the therapist observed that Plaintiff's affect was anxious and depressed, which matched Plaintiff's own account of his mood. (Id.) Plaintiff was diagnosed with Major Depression (single and moderate), Panic Disorder without Agoraphobia, and Opioid Dependence in full, sustained remission. (R. at 192.)

Plaintiff's current and highest global assessment of functioning score was a 58.[2] (R. at 192.)

Dr. Zurlo evaluated Plaintiff again on May 15, 2007 and noted that he had been doing "fairly well" managing his late-stage HIV infection. (R. at 179.) Dr. Zurlo did report, however, that Plaintiff had lost additional weight since his last visit which was "surprising since both he [Plaintiff] and his girlfriend described that he really has a ravenous appetite." (Id.) Plaintiff weighed 121 pounds at the time of this appointment. (Id.) Dr. Zurlo recommended that Plaintiff's mental health issues continue to be addressed. (Id.) Dr. Zurlo concluded:

> From a medical perspective, the patient has done very very well with respect to his HIV infection. I am not sure that there is any medical going on with him, though I am surprised he has not gained weight, but is instead losing it. This is against a background of really quite a good appetite.

(Id.)

Plaintiff returned to Philhaven numerous times from May 29th to August 1, 2007 to address his mental health issues, despite a few appointments where he did not show

---

[2] The Global Assessment of Functioning (GAF) is a numeric scale used to measure the psychological, social, and occupational functioning of adults. A GAF score between 51 and 60 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994).

up. (R. at 198-200.) The therapist consistently noted that Plaintiff had made only limited progress regarding the treatment of his anxiety and depression. (R. at 198.) It was also during these appointments that the various causes of Plaintiff's depression were revealed and addressed. (R. at 198-200.) During his June 7, 2007 appointment, Plaintiff told the therapist that he went shopping, got dizzy, and passed out in a store. (R. at 200.) He reported similar occurrences involving falls as a result of dizziness at his June 14th and June 25th appointments. (R. at 201-02.) Plaintiff also told the therapist that he stays busy by doing chores around the house as well as doing his girlfriend's daughter's paper route. (R. at 201.) In addition, Plaintiff reported at his July 16, 2007 appointment that he had difficulty sleeping and had experienced back pain, but no more passing out. (R. at 204.) Further, the therapist noted that Plaintiff "seems to be worrying himself [in]to insomnia and undue stress in his life." (Id.)

On September 26, 2007, Plaintiff's therapist completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) ("Statement"). (R. at 207.) The therapist completed the Statement based on observations made during therapy sessions with Plaintiff. The therapist

indicated that Plaintiff had "good"[3] ability to carry out

these work-related tasks:

1. Maintain an ordinary routine without special supervision;
2. Work with or near others without being distracted by them;
3. Make simple work-related decisions;
4. Interact appropriately with the public;
5. Ask simple questions and request assistance;
6. Accept instructions and respond appropriately to criticism from supervisors
7. Get along with co-workers and peers;
8. Adhere to basic standards of neatness and cleanliness; and
9. Travel in unfamiliar places or use public transportation.

(R. at 207-08.)


The therapist indicated that Plaintiff had "fair"[4] ability

to complete the following tasks:

1. Remember locations and work-like procedures;
2. Carry out short, simple instructions;
3. Maintain attention and concentration for extended periods;
4. Perform activities with a schedule, maintain regular attendance, and be punctual;
5. Maintain socially appropriate behavior;
6. Respond appropriately to changes in the work setting;
7. Be aware of normal hazards and take appropriate precautions;
8. Travel in an unfamiliar place or use public transportation; and
9. Set realistic goals or make plans independently of others.

---

[3] This term is described as, "The individual can perform the activity satisfactorily most of the time." (R. at 207.)
[4] This term is described as, "The individual can perform the activity satisfactorily some of the time." (R. at 207.)

(Id.)

The therapist additionally indicated that Plaintiff had

"poor"[5] ability to complete the following tasks:

1. Understand and remember short, simple instructions;
2. Complete a normal workday and workweek; and
3. Perform at a consistent pace.

(Id.)

### C. Administrative hearing and ALJ's decision

ALJ Train held a hearing during which Plaintiff as well as

a vocational expert, Ms. Sheryl Bustin, testified. (R. at 32-

61.) During testimony, Plaintiff spoke through a Spanish

interpreter. (R. at 32.) He indicated that he came to the United

States from Puerto Rico at fourteen years old and currently

lives with his girlfriend and her children. (R. at 40-41.)

Plaintiff indicated that although he assists his girlfriend's

daughter with her paper route, he does not work and cannot do so

because "I fall in the streets. I slip and fall." (R. at 41.)

When asked how he gets along with others, Plaintiff indicated,

"I don't have problems, but I see people and momentarily, I

don't know, I get scared or something." (R. at 42.)

When asked by the ALJ about whether Plaintiff has used

drugs since he was incarcerated for substance abuse, Plaintiff

stated that he has not used drugs since being released from

---

[5] This term is described as, "No useful ability to function." (R. at 207.)

prison and is in a Narcotics Anonymous program. (R. at 43.)
Other than the paper route position, Plaintiff noted that he
went to look for a job at Labor Ready upon his release from
prison; however, during his second day on the job, Plaintiff
alleged that he fainted because they had him working in "a very
hot place." (R. at 44.) Plaintiff also revealed that he was 160
pounds upon release from prison and had lost approximately 40 to
50 pounds since his release despite eating three meals and a
snack each day. (R. at 48.)

Ms. Sheryl Bustin, the vocational expert, subsequently
testified regarding Plaintiff's past work experiences as a
laborer, which was defined as unskilled, medium work, and a
spray feeder, which was deemed to be unskilled, light work. (R.
at 52-53.) When asked by the ALJ to assume that Plaintiff had
HIV but was asymptomatic, Ms. Bustin testified that he should be
able to perform his previous jobs. (R. at 54.) The ALJ then
asked Ms. Bustin to consider the types of jobs a hypothetical
individual could do if said individual was able to perform light
work without significant interaction with others. (Id.) To this
question, Ms. Bustin responded that such a person could work as
a hand-packer, which had two million jobs nationally, 43,000
jobs in the state, and 4,000 jobs locally, an office cleaner,
which had seven million jobs nationally, 400,000 jobs in the
state, and 6,000 jobs locally, or a vending machine attendant,

which had two million jobs nationally, 38,000 jobs in the state, and 2,000 jobs locally. (R. at 54-55.) Ms. Bustin also testified that the aforementioned jobs could all be performed in temperature-controlled environments. (R. at 56.)

In his written decision, ALJ Train ultimately determined that Plaintiff was not disabled. (R. at 17.) He began the required five-step analysis[6] by finding that Plaintiff had not engaged in substantial gainful activity since his alleged onset of disability. (R. at 14.) At the second step of the disability analysis, the ALJ determined that Plaintiff's HIV positive status, asthma, Anxiety and Major Depressive Disorder, as well as history of drug and alcohol dependence were all severe impairments under 20 C.F.R. § 416.920(d). (Id.) On step three of the analysis, however, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§§ 416.920(d), 416.925, and 416.926). (R. at 14-15.) Specifically, the ALJ concluded,

> The medical evidence of record fails to establish:
> that the claimant's HIV+ results in an impairment that
> meets or equals a requirement of any pertinent
> section(s) of Listings 2.00 (Special Senses and
> Speech), 4.00 (Cardiovascular System), 5.00 (Digestive
> System), 6.00 (Genito-Urinary System), 7.00 (Hemic and
> Lymphatic System), 8.00 (Skin) or 14.00 (Immune
> System); or that the claimant's asthma meets or equals
> a requirement of sections 3.02 and 3.03. The

---

[6] See 20 C.F.R. § 404.1520(b) (describing the analysis).

> claimant's mental impairments, considered singly and
> in combination, also do not meet or medically equal
> the criteria of listings 12.04, 12.06, or 12.09.
> (R. at 14.)

ALJ Train next evaluated Plaintiff's residual functional
capacity (RFC), or the activity that Plaintiff was still capable
of performing despite the aforementioned impairments. The ALJ
determined that Plaintiff retained the RFC for activities
including lifting up to twenty pounds at a time, standing and/or
walking a total of six hours in an eight-hour workday, and
pushing and/or pulling as much as Plaintiff can carry and/or
lift. (R. at 15.) Additionally, the ALJ noted that said work
must not involve skilled work tasks, significant interaction
with others, and must be completed in a temperature controlled
environment by someone who has HIV but is asymptomatic with
medication. (Id.)

At the fourth step, the ALJ determined that Plaintiff was
unable to perform any past relevant work as per 20 C.F.R. §
416.965, as Plaintiff's RFC precluded Plaintiff from acting as a
grinder/laborer or spray unit feeder, both of which required
light and medium exertional levels. (R. at 19.) Lastly, at step
five, based on Plaintiff's RFC as well as other vocational
factors, the ALJ determined that Plaintiff was capable of
performing other work that existed in substantial numbers in the

national economy. (Id.) As such, the ALJ determined that
Plaintiff was not disabled. (Id.)

## III. DISCUSSION

### A. Standard of Review

Federal statute empowers the Court to review the
Commissioner's decision to deny disability benefits. 42 U.S.C. §
405(g). The Court's review is deferential to the Commissioner's
decision, and the Commissioner's factual findings are conclusive
where they are supported by "substantial evidence." Id.; see
also Cunningham v. Comm'r of Soc. Sec., No. 11-2633, 2012 WL
6200379, at *2 (3d Cir. Dec. 13, 2012) (summarizing the
deferential standard of review). Substantial evidence is defined
as "more than a mere scintilla," meaning "such relevant evidence
as a reasonable mind might accept as adequate to support a
conclusion." Richardson v. Perales, 402 U.S. 389, 400 (1971);
see also Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d
Cir. 2012) (using the same language as Richardson). The Court
may not weigh the evidence or substitute its own conclusions for
those of the ALJ. Buffington v. Comm'r of the Soc. Sec. Admin.,
187 Soc. Sec. R. Serv. 383, 2013 WL 796311, at *3 (D.N.J. Mar.
4, 2013).

The Commissioner utilizes a five-step sequential analysis
to evaluate disability claims. 20 C.F.R. § 404.1520. If one of

the steps is not met, the evaluation ends and the individual's disability claim is denied. The steps are as follows:

1.) If the claimant is currently engaged in substantial gainful employment, he will be found "not disabled."

2.) If the claimant does not suffer from a "severe impairment," he will be found "not disabled."

3.) If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled."

4.) If the claimant can still perform work he has done in the past ("past relevant work") despite the severe impairment, he will be found "not disabled."

5.) Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education and past work experience to determine whether or not he is capable of performing other work which exists in the national economy. If he is incapable, a finding of disability will be entered. On the other hand, if the claimant can perform other work, he will be found not disabled.

20 C.F.R. § 404.1520(b)-(f).

**B. Parties' Arguments**

Plaintiff first contends that the ALJ erred in concluding that Plaintiff's HIV is asymptomatic, focusing on laboratory test results such as viral loads and CD4 counts instead of the observable manifestations of the disease. (Pl. Br. at 14.) Specifically, Plaintiff argues that the ALJ failed to recognize Plaintiff's significant weight loss despite Plaintiff's strict adherence to his viral medications as well as "ravenous"

appetite. (R. at 179; Pl. Br. at 14.) Plaintiff points out that
he had lost 15 pounds between August 15, 2006 and May 15, 2007,
which happened to be more than 10% of his initial body weight.
(Pl. Br. at 14; Compare R. at 131 (136 pounds) with R. at 179
(121 pounds).) On June 7, 2007 when the administrative hearing
took place, Plaintiff claimed he weighed 115 pounds, thereby
resulting in a loss of over 20 pounds since August 15, 2006.
(Pl. Br. at 14.) In addition, Plaintiff argues that the ALJ
failed to recognize Plaintiff's fatigue and syncopal episodes as
further manifestations of his HIV diagnosis. (Id.) In failing to
acknowledge and give credence to the aforementioned, Plaintiff
contends that the ALJ made a critical mistake of fact which
therefore significantly impacted the ALJ's evaluation of
Plaintiff's disability claim. (Id.)

Plaintiff further argues that the ALJ's failure to
recognize Plaintiff's substantial weight loss as a manifestation
of the HIV led the ALJ to improperly conclude that Plaintiff's
disability did not meet or equal one of the required Listings of
Impairments at Step Three of the disability analysis. (Pl. Br.
at 15.) First, Plaintiff contends that the evidence in the
record indicates that he did indeed meet Listing 14.08K, which
states:

> Repeated (as defined in 14.00I3) manifestations of
> HIV infection, including those listed in 14.08A-J,
> but without the requisite findings for those

16

listings (for example, carcinoma of the cervix not
meeting the criteria in 14.08E, diarrhea not
meeting the criteria in 14.08I), or other
manifestations (for example, oral hairy
leukoplakia, myositis, pancreatitis, hepatitis,
peripheral neuropathy, glucose intolerance, muscle
weakness, cognitive or other mental limitation)
resulting in significant, documented symptoms or
signs (for example, severe fatigue, fever, malaise,
involuntary weight loss, pain, night sweats,
nausea, vomiting, headaches, or insomnia) and one
of the following at the marked level:

1. Limitation of activities of daily living.
2. Limitation in maintaining social functioning.
3. Limitation in completing tasks in a timely
manner due to deficiencies in concentration,
persistence, or pace. (20 C.F.R. Part 404, Subpart
P, Appendix 1, § 14.08K.)

Plaintiff contends that the record clearly shows that he has

experienced significant, involuntary weight loss as well as

severe fatigue, both of which are listed in the aforementioned

section. (Pl. Br. at 16.) Plaintiff also points out his weight

loss meets the requirements under § 14.08H, which provides:

HIV wasting syndrome, characterized by involuntary weight
loss of 10 percent or more of baseline (computer based on
pounds, kilograms, or body mass index (BMI)) or other
significant involuntary weight loss as described in
14.00F5, and in the absence of a concurrent illness that
could explain the findings. With either:

1. Chronic diarrhea with two or more loose stools
daily lasting for 1 month or longer; or
2. Chronic weakness and documented fever greater
than 38°C (100.4°F) for the majority of 1 month or
longer. (20 C.F.R. Part 404, Subpart P, Appendix 1,
§ 14.08H.)

Further, Plaintiff notes that Dr. Zurlo, his treating physician, indicated that he had experienced a "marked" limitation in social functioning, which is also listed under § 14.08K. (Pl. Br. at 17; R. at 146.) As such, Plaintiff claims the ALJ should have concluded that his disability met or equaled the aforementioned listings. (Pl. Br. at 18.) Instead, however, Plaintiff alleges the ALJ ruled to the contrary and failed to provide reasoning as to why he reached that conclusion. (Id.)

Plaintiff additionally argues that the ALJ erred by rejecting the well-supported opinion of Plaintiff's treating physician and therapist. (Pl. Br. at 19.) Specifically, Dr. Zurlo indicated on the Medical Source Statement that Plaintiff had "marked" difficulties in maintaining social functioning. (R. at 146.) Dr. Zurlo's finding was clearly rejected by the ALJ, who wrote in his final decision that such a conclusion "is not supported by the claimant's activities of daily living and is inconsistent with the claimant's testimony that he generally gets along with people." (R. at 18.) When asked whether Plaintiff got along with others during his testimony, Plaintiff stated, "I don't have any problems, but I see people and momentarily, I don't know, I get scared or something." (R. at 42.) Plaintiff argues that the ALJ incorrectly concluded that Plaintiff's social functioning was only moderately affected based on his testimony, thereby disregarding the medical reports

detailing such issues. (Pl. Br. at 21.) Moreover, Plaintiff
argues that the ALJ applied the wrong standard to Dr. Zurlo's
medical opinion, citing Listing 14.00I(7) which states,

> *Social functioning* includes the capacity to
> interact independently, appropriately, effectively,
> and on a sustained basis with others. It includes
> the ability to communicate effectively with others.
> We will find that you have a 'marked' limitation in
> maintaining social functioning if you have a
> serious limitation in social interaction on a
> sustained basis because of symptoms, such as pain,
> severe fatigue, anxiety, or difficulty
> concentrating, or a pattern of exacerbation and
> remission, caused by your immune system disorder
> (including manifestations of the disorder) or its
> treatment, even if you are able to communicate with
> close friends or relatives. (20 C.F.R. Part 404,
> Subpart P, Appendix 1, § 14.00I(7).)

Plaintiff argues that the record clearly demonstrates he has
experienced weakness, fatigue, and syncopal episodes which have
consequently impacted his social functioning, even though he is
still able interact with others on a limited basis. (Pl. Br. at
22.) As such, Plaintiff contends that the ALJ made his decision
based on an erroneous interpretation of the law, thereby
requiring reversal. (Id.)

   In addition to rejecting Dr. Zurlo's opinion, the Plaintiff
argues that the ALJ also ignored the records provided by the
therapist at Philhaven which spoke to the nature of Plaintiff's
social functioning. (Pl. Br. at 23.) Specifically, the ALJ
rejected the information presented in the therapist's Medical

Source Statement, claiming that said information was "based primarily on the claimant's subjective statements and the therapist's observations." (R. at 19.) Moreover, Plaintiff argues that the ALJ rejected evidence indicating Plaintiff's limited progress throughout therapy sessions as well as the therapist's clinical findings of depression and anxiety. (Pl. Br. at 24.) Plaintiff contends that the ALJ's decision to discount the therapist's subjective observations was improper, and as such, the ALJ should have considered her clinical findings. (Id.)[7]

In response to Plaintiff's numerous contentions, the Commissioner first argues that the ALJ's decision in finding Plaintiff's HIV asymptomatic was supported by the record. (Def. Br. at 10.) Specifically, the Commissioner posits that Plaintiff's significant weight loss was actually due to his reduced appetite and problems with his teeth, both of which were reported during Plaintiff's appointment with Dr. Zurlo on

---

[7] Plaintiff also contends that the ALJ erroneously relied on the vocational expert's answer to an incomplete hypothetical question posed to her during the administrative hearing. Specifically, Plaintiff argues that the ALJ's question to the expert failed to reflect all of Plaintiff's impairments, as the ALJ omitted key evidence by suggesting to the expert that Plaintiff only had moderate limitations in maintaining concentration, persistence, and pace. (Pl. Br. at 25-6.) It is unnecessary, however, for the Court to address this argument since the Court concludes that the ALJ failed to rely on the evidence presented in the record in deeming Plaintiff does not meet Step Three of the disability analysis, discussed infra at subsection III.C.

October 31, 2006. (Id.; R. at 164.) Further, the Commissioner
claims that another contributor to Plaintiff's weight loss could
indeed be his depression. (Id.) The Commissioner also argues
that the records provided no causal connection between
Plaintiff's HIV status and his syncopal episodes. (Id.) In
support of this statement, the Commissioner cites the testimony
from the administrative hearing, in which Plaintiff's attorney
indicated that Plaintiff had an appointment with a neurologist
and there might actually be a separate neurological issue
outside of Plaintiff's HIV status affecting Plaintiff. (Id.; R.
at 50-51.) Lastly, the Commissioner cites Dr. Zurlo's comments
in his medical report, stating Plaintiff's HIV was "well-
controlled" and that Plaintiff was likely to fare well if he
continued with treatment. (Def. Br. at 10; R. at 173.)

The Commissioner also argues that the ALJ was correct in
finding that Plaintiff's HIV did not meet or equal any of the
listed impairments. (Def. Br. at 11.) Specifically, the
Commissioner states that the record does not show that Plaintiff
suffered from severe fatigue. For example, the Commissioner
cites the fact that Plaintiff reported only "some fatigue"
during his visit with Dr. Zurlo on September 8, 2006 (R. at
128.) In addition, the Commissioner notes that Plaintiff was
able to get out of bed every day despite feeling some general
weakness. (R. at 164.) Further, the Commissioner contends that

the Plaintiff did not suffer from severe fatigue given the fact that he completed his girlfriend's daughter's paper route as well other daily activities such as showering, making the bed, taking out the trash, and other household chores. (R. at 41, 102-03.) The Commissioner also points out that Dr. Zurlo failed to indicate on the Medical Source Statement that Plaintiff had HIV wasting syndrome. (R. at 144-45.)

In supporting the ALJ's decision that Plaintiff did not have a marked limitation in social functioning, the Commissioner first notes that the ALJ did not misconstrue Plaintiff's testimony regarding how he gets along with others. (Def. Br. at 11; R. at 42.) Specifically, the Commissioner states that even if Plaintiff stated that he momentarily "got scared or something" when being around other people, this testimony did not negate the fact that he initially answered that he does not have any issues getting along with others. (Def. Br. at 11; R. at 42.) Further, the Commissioner uses the fact that Plaintiff has maintained a stable relationship with his girlfriend and the fact that his therapist at Philhaven described him as cooperative in their interview as evidence of his social functioning skills. (R. at 42, 191.) Lastly, in response to Plaintiff's claim that the ALJ utilized the wrong standard in evaluating Dr. Zurlo's opinion, the Commissioner states that such a claim is without merit, as the record has clearly

indicated that Plaintiff did not have "a serious limitation in social interaction on a sustained basis." (See 20 C.F.R. Part 404, Subpart. P, Appendix 1, §14.00I(7).)

The Commissioner argues that the ALJ did indeed correctly evaluate the opinion of Plaintiff's therapist at Philhaven. (Def. Br. at 13.) Specifically, the Commissioner states that all of the evidence in the record spoke to the contrary regarding the therapist's mere observational assessment of Plaintiff based on Plaintiff's subjective statements. (R. at 19.) Had the therapist provided more objective findings such as concrete laboratory results or medical signs, the Commissioner argues the ALJ would have afforded more weight to such evidence. (Def. Br. at 13.) Further, as the ALJ noted in his opinion, the Commissioner points out that Plaintiff was found to have a GAF score of 58, meaning moderate symptoms of difficulties in functioning, which is consistent with someone who is not disabled. (R. at 18.) As such, the Commissioner contends the ALJ correctly found that the therapist's observational findings were inconsistent with the evidence in the record. (Def. Br. at 14.)

Finally, contrary to Plaintiff's contention that the ALJ did not provide an adequate explanation of his findings regarding Plaintiff's disability analysis at Step Three, the Commissioner states that the ALJ went far beyond a mere assertion and did in fact provide a detailed analysis.

Specifically, the Commissioner asserts that the ALJ provided the specific listings which he considered in making his final decision as well as a discussion pertaining to the relevant medical evidence found in the record to support his conclusion that Step Three was not met. (Id.)

### C. Analysis of Step Three

The primary issue before the Court is whether the record supports the ALJ's conclusion that Plaintiff failed to meet one of the required listings set forth in Step Three of the disability analysis. Specifically, Plaintiff raises three objections to the ALJ's decision. First, Plaintiff argues that the ALJ erred by concluding Plaintiff's HIV was asymptomatic. Second, Plaintiff argues the ALJ erred by finding Plaintiff does not meet or equal any of the listing requirements under Step Three of the disability analysis. Lastly, Plaintiff contends that the ALJ erroneously rejected the opinions of his treating physician and therapist.

### i. Whether the ALJ erred by concluding Plaintiff's HIV was asymptomatic

In executing a thorough analysis of an individual's claim, the Commissioner is required to consider all evidence in the record. 42 U.S.C. § 423(d)(5)(B); Plummer v. Apfel, 186 F.3d 422, 433 (3d Cir. 1999). The Act states: "In making any determination with respect to whether an individual is under a

disability..., the Commissioner of Social Security shall consider all evidence available in such individual's case record...." § 423(d)(5)(B). At the same time, the ALJ is not required to produce "an exhaustive discussion of all the evidence." Hernandez v. Comm'r of Soc. Sec., 89 F. App'x 771, 773-74 (3d Cir. 2004). However, "[t]he ALJ's failure to address evidence in direct conflict with his/her findings or to reject uncontradicted evidence without a clear statement of the reasoning is erroneous." Landeta v. Comm'r of Soc. Sec., 191 F. App'x 105, 110 (3d Cir. 2006); Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994). See also Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000) (remanding case to ALJ for failure to consider witness testimony).

In this case, the ALJ failed to consider evidence in the record relevant to his conclusion that Plaintiff's HIV was asymptomatic. Plaintiff complained of various symptoms throughout the course of his treatment with both Dr. Zurlo as well as his therapist at Philhaven, including weight loss, fatigue, weakness, and syncopal episodes. (R. at 148, 156, 166, 200.) Regarding his substantial weight loss, which appears to be the most tangible clinical finding, Dr. Zurlo recorded that Plaintiff weighed 136 pounds at his first appointment and 121 pounds at his last appointment. (Compare R. at 131 (136 pounds)

<u>with</u> R. at 179 (121 pounds).)[8] Further, at the hearing on
September 26, 2007, or four months after Plaintiff's last
recorded appointment with Dr. Zurlo, Plaintiff stated he
weighed, "[l]ike 115, 112" pounds. (R. at 47.) Even during
Plaintiff's last appointment with Dr. Zurlo on May 15, 2007, Dr.
Zurlo expressed concern about Plaintiff's weight loss despite
the fact that Plaintiff was doing well with respect to his HIV+
status. (R. at 179.) Dr. Zurlo noted he was, "surprised he
[Plaintiff] has not gained weight, but is instead losing it.
This goes against a background of really quite a good appetite."
(R. at 179.) The aforementioned observations, all of which were
detailed in Dr. Zurlo's medical reports, along with the fact
that Plaintiff's substantial and rapid weight loss had been
documented from the first to the last appointments in the
record, indicate that Plaintiff was indeed symptomatic even when
his HIV appeared to be under control, contrary to what the ALJ
concluded.

---

[8] The Court notes that although Dr. Zurlo indicated Plaintiff
suffered from Anorexia as an additional manifestation of his
HIV+ status on the Medical Source Statement dated December 12,
2006, there is no other mention in the record from either Dr.
Zurlo or Plaintiff's treating therapist supporting such a
finding. Said finding was made towards the beginning of
Plaintiff's treatment with Dr. Zurlo, as Plaintiff's first
appointment was on September 4, 2006. (R. at 131, 146.) Further,
the ALJ in his final decision did not conclude Plaintiff
suffered from Anorexia. As such, the record supports the ALJ's
conclusion that Plaintiff's weight loss was not due to Anorexia.

The ALJ does little to address the substantial, involuntary weight loss experienced by Plaintiff despite an abundance of evidence in the record. Rather, the ALJ simply states, "[w]hile the claimant's complaints are extensive, his allegations regarding symptoms and limitations from HIV+ and asthma are unsupported by objective and clinical findings." (R. at 17.) The Court finds that Plaintiff's substantial weight loss was documented in an objective manner and was not addressed by the ALJ in his decision.[9]

"Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981)(citations omitted). The ALJ failed to explain in his decision how the objective clinical findings of Plaintiff's treating physician and therapist did not support the fact that Plaintiff was symptomatic. The ALJ should have explained in his written decision as to how and why he found Plaintiff's HIV to be asymptomatic, since there were objective clinical findings to the contrary. This absence of

---

[9] Further, it is important to note that it is defendant's counsel, not the ALJ, who suggests Plaintiff's weight loss was due to a reduced appetite, depression, or even sensitivity issues with his teeth. (Def. Br. at 10; R. at 164, 185.)

reasoning about weight loss, tethered to the record, requires remand so that the ALJ may address the issue more fully.

Because the Court concludes that the ALJ failed to articulate reasons for his finding that Plaintiff's HIV was asymptomatic, the Court must also examine whether the ALJ erred in determining that Plaintiff's HIV did not meet one of the required listings under Step Three of the disability analysis.

### ii. Whether the ALJ erred by finding Plaintiff does not meet or equal the listings under Step Three

The ALJ's discussion at Step Three of the required five-step analysis, or whether Plaintiff's HIV+ status meets or equals a listed impairment in the federal regulations, includes the following:

> The medical evidence of record fails to establish: that the claimant's HIV+ results in an impairment that meets or equals a requirement of any pertinent section(s) of Listings 2.00 (Special Senses and Speech), 4.00 (Cardiovascular System), 5.00 (Digestive System), 6.00 (Genito-Urinary System), 7.00 (Hemic and Lymphatic System), 8.00 (Skin) or 14.00 (Immune System); or that the claimant's asthma meets or equals a requirement of sections 3.02 and 3.03.

(R. at 14.)

Regarding Plaintiff's mental impairments in light of Step Three, the ALJ reasoned:

> The claimant's mental impairments, considered singly and in combination, also do not meet or medically equal the criteria of listings 12.04, 12.06, or 12.09. (R. at 14.) In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the

28

mental impairments must result in at least two of the
following: marked restriction of activities of daily
living; marked difficulties in maintaining social
functioning; marked difficulties in maintaining
concentration, persistence, or pace; or repeated
episodes of decompensation, each of extended duration
. . . In activities of daily living, the claimant has
moderate restriction. In social functioning, the
claimant has moderate difficulties. With regard to
concentration, persistence or pace, the claimant has
moderate difficulties. As for episodes of
decompensation, the claimant has experienced no
episodes of decompensation. Because the claimant's
mental impairments do not cause at least two "marked"
limitations or one "marked" limitation and "repeated"
episodes of decompensation, the "paragraph B" criteria
are satisfied. In this case, the evidence fails to
establish the presence of the "paragraph C" criteria.
These findings are supported by objective and clinical
findings, the claimant's treatment and his activities
of daily living.

(Id.)

The Court finds that the ALJ's decision does not address
important evidence in the record which contradicts his finding
that Plaintiff did not meet one of the listed impairments.  See
Cotter, 642 F.2d at 705 (the ALJ must provide "some indication
of the evidence which was rejected. In the absence of such an
indication, the reviewing court cannot tell if significant
probative evidence was not credited or simply ignored.").

    Specifically, Plaintiff's symptoms, all of which are
thoroughly documented in the record, support Plaintiff's
argument that he did meet and satisfy at least the first part of
Listing 14.08K. Listing 14.08K states:

Repeated (as defined in 14.00I3) manifestations of HIV infection, including those listed in 14.08A–J, but without the requisite findings for those listings (for example, carcinoma of the cervix not meeting the criteria in 14.08E, diarrhea not meeting the criteria in 14.08I), or other manifestations (for example, oral hairy leukoplakia, myositis, pancreatitis, hepatitis, peripheral neuropathy, glucose intolerance, muscle weakness, cognitive or other mental limitation) resulting in **significant, documented symptoms or signs** (for example, **severe fatigue**, fever, malaise, **involuntary weight loss**, pain, night sweats, nausea, vomiting, headaches, or **insomnia**) and one of the following at the marked level:

1. Limitation of activities of daily living.
2. Limitation in maintaining social functioning.
3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

(20 C.F.R. Part 404, Subpart P, Appendix 1, §14.08K.) (emphasis added.)

As outlined above and made evident in the record, Plaintiff experienced weight loss as a manifestation of his HIV diagnosis, thereby potentially satisfying the first part of the aforementioned listing. This weight loss was involuntary, as Plaintiff reported he ate three meals plus a snack each day, and his girlfriend confirmed that he had quite a "ravenous" appetite. (R. at 48, 179.) Besides the apparent downward trend in Plaintiff's weight as noted during his various appointments, Dr. Zurlo also confirmed such a finding on the Medical Source Statement, indicating that Plaintiff had experienced significant weight loss as a manifestation of his HIV+ status, losing

approximately ten pounds in the last four months. (R. at 146.) In addition, Plaintiff also expressed to his treating physician that he experienced fatigue and insomnia, both of which are cited in the abovementioned listing. (R. at 166-67.) The ALJ did not discuss this substantial, documented weight loss under Listing 14.08K and must do so on remand.

The second part of listing 14.08K requires that one of three limitations in social functioning and daily living be met at the marked level. In this case, Dr. Zurlo indicated on the Medical Source Statement that Plaintiff had "marked difficulties in maintaining social functioning." (R. at 146.) Further, Plaintiff's therapist at Philhaven indicated that that Plaintiff had "poor"[10] ability to complete the following tasks:

1. Understand and remember short, simple instructions;
2. Complete a normal workday and workweek; and
3. Perform at a consistent pace.

(R. at 207-08.)

Based on his decision at Step Three, it appears the ALJ did not find Dr. Zurlo's evaluation or Plaintiff's therapist's observations to be credible or reliable sources. Although the ALJ is not bound to accept Dr. Zurlo's check-box conclusion or the therapist's observations, he must explain why he did not accept such conclusions.

---

[10] This term is described as, "No useful ability to function." (R. at 207.)

A guiding principle for evaluating disability claims is
that the ALJ give significant weight to treating physicians'
reports, especially "'when their opinions reflect expert
judgment based on a continuing observation of the patient's
condition over a prolonged period of time.'" Morales v. Apfel,
225 F.3d 310, 317 (3d Cir. 2000)(quoting Plummer, 186 F.3d at
429). If the ALJ chooses to reject the treating physician's
evaluation of the claimant, the ALJ may not make "speculative
inferences from medical reports." Morales, 225 F.3d at 318
(quoting Plummer, 186 F.3d at 429). The ALJ can reject "a
treating physician's opinion outright only on the basis of
contradictory medical evidence," and not on the basis of the
ALJ's own opinion or credibility judgment. (Id.)

In this case, the ALJ rejected the conclusions made by both
Plaintiff's treating physician and therapist in support of what
appears to be his own credibility determinations.  Specifically,
the ALJ states, "After considering the evidence of record, the
undersigned finds that the claimant's medically determinable
impairments could reasonably be expected to produce the alleged
symptoms, but that the claimant's statements concerning the
intensity, persistence, and limiting effects of these symptoms
are not entirely credible." (R. at 16.)  The ALJ rejected Dr.
Zurlo's finding that Plaintiff had marked difficulties in
maintaining social functioning, stating it "is not supported by

32

the claimant's activities of daily living and is inconsistent with the claimant's testimony that he generally gets along with people." (R. at 18.)

First, while the record shows that Plaintiff is indeed capable of performing a variety of daily activities, these daily activities primarily consist of interaction with his girlfriend and his girlfriend's daughter.  Listing 14.00I(7) expressly states that a person can have marked difficulties in social functioning "even if [a person is] able to communicate with close friends or relatives." (See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 14.00I(7).)  The ALJ did not discuss the implications of this listing when evaluating the evidentiary weight of Plaintiff's daily interactions with his girlfriend and her daughter with regard to Plaintiff's level of social functioning and should do so on remand.

Second, and more significantly, Plaintiff's treating physicians both indicated that he was limited in his ability to function socially.  The primary evidence that contradicted this finding was Plaintiff's own testimony that he got along well with others.  Plaintiff testified, "I don't have any problems, but I see people and momentarily, I don't know, I get scared or something." (R. at 42.)  This statement was made through a translator at the hearing.

The ALJ in his decision found Plaintiff's testimony at the hearing more credible than the reports of Plaintiff's two treating physicians. While the ALJ is entitled to credit Plaintiff's testimony, the ALJ did not provide any explanation for his decision to reject the report of the treating physicians which directly contradicted Plaintiff's statement.

It is well established that "[t]he ALJ'S failure to address evidence in direct conflict with his/her findings . . . without a clear statement of the reasoning is erroneous." Landeta, 191 Fed. Appx. At 110. Furthermore, "[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a prolonged period of time." Morales, 225 F.3d at 317.

Dr. Zurlo and Plaintiff's therapist at Philhaven observed Plaintiff's condition over a prolonged period of time and both concluded that Plaintiff had marked difficulties in social functioning. In finding that Plaintiff did not have marked difficulties in maintaining social functioning, the ALJ did not explain why he rejected the opinions of Plaintiff's treating physician and therapist. The ALJ's failure to address the findings of Plaintiff's two treating physicians and explain his reasons for rejecting these findings requires remand.

For the foregoing reasons, the Court will remand this case to the ALJ for further findings regarding Plaintiff's social functioning and why he rejected the treating physician and therapist's observations.

### D. Analysis of Step Five

Step Five of the disability analysis necessitates that the ALJ determine what work, if any, Plaintiff would be able to do after being deemed unable to perform past relevant work at Step Four. Specifically, 20 C.F.R. § 416.920(f) states:

> If the Claimant does not retain the RFC to perform past relevant work, then the Claimant's RFC, age, education, and past relevant work experience will be considered to determine if there is other work that the Claimant can do; if not, the claim will be approved.

Often, testimony of a vocational expert is taken to determine a claimant's RFC. A vocational expert can testify about the nature of certain jobs in the national economy and answer hypothetical questions. In order for a hypothetical question to be considered complete, the question that the ALJ poses to the vocational expert must adequately reflect all of the claimant's medical impairments as supported by the record. Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) ("Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response.");

Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)

(holding "a hypothetical question must reflect all of a

claimant's impairments that are supported by the record;

otherwise the question is deficient and the expert's answer to

it cannot be considered substantial evidence").

In this case, the ALJ asked the vocational expert to assume

that Plaintiff was an HIV+ individual but asymptomatic with

medication. (R. at 53.) Further, he stated:

> Let's say, just sort of for caution, say he's
> doing a full range of light work. Let's assume
> that he suffers from depression and anxiety, such
> that he's limited to unskilled work, that is work
> that can be learned within 30 days. Let's assume
> further that he does not require significant
> interaction with others. If that's an accurate
> description of his limitations, would you expect
> a hypothetical individual of the same, education,
> past work activity as Mr. Montes to do other
> work?

(R. at 54.)

Plaintiff contends that the ALJ improperly rejected the

opinions of Plaintiff's treating physician and therapist,

thereby framing the hypothetical question to the vocational

expert in an incomplete way. (Pl. Br. at 25.) Specifically,

Plaintiff argues that the ALJ erred by not including in the

hypothetical question his finding that Plaintiff experienced

moderate difficulties in concentration, persistence, and pace.

(Id. at 26.) Defendant contends, however, that said findings

were appropriately applied at Steps Two and Three to determine

the severity of Plaintiff's mental impairments, and in turn incorporated into the ALJ's hypothetical question when asking the expert to assume that Plaintiff could not perform anything other than unskilled work tasks. (Def. Br. at 15; R. at 54.)

Although the hypothetical question posed to the vocational expert was incomplete based on the reference to Plaintiff as asymptomatic, said phrasing likely did not lead to prejudice against the Plaintiff in discerning the availability of jobs he could potentially perform. The vocational expert did indeed indicate that given the claimant's age, education, work experience, and residual functional capacity, he could work as an office cleaner, hand packer, or vending machine attendant in controlled temperature settings. (R. at 55-56.)

The Court notes, however, that when the ALJ subsequently suggested in a hypothetical question that the claimant had only "fair" ability in a variety of tasks, the vocational expert testified, "with so many areas being fair, which as you indicated, is some of the time, I think that an individual with this many areas being fair would have difficulty maintaining employment. I mean, if it was just one or two areas, it would be one thing...." (R. at 58.) This testimony is relevant and, depending on the ALJ's analysis of Plaintiff's social functioning, could impact the ultimate decision of whether

Plaintiff is entitled to disability benefits. Accordingly, this finding requires further analysis upon remand.

## IV. CONCLUSION

The Court will vacate the Commissioner's final decision and remand the matter to allow the ALJ to develop his reasoning and analysis as to Plaintiff's symptoms, namely involuntary weight loss, and ability to maintain social functioning at Step Three. An accompanying Order will be entered.


**July 31, 2013**                               **s/ Jerome B. Simandle**
Date                                            JEROME B. SIMANDLE
                                                  Chief U.S. District Judge